J-A20026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JERON BROWN | |
| Appellant | No. 1679 WDA 2015 |

Appeal from the Judgment of Sentence Entered September 24, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No: CP-02-CR-0004313-2015

BEFORE:  BOWES, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED NOVEMBER 22, 2016**

Appellant Jeron Brown appeals from the September 24, 2015 judgment of sentence entered in the Court of Common Pleas of Allegheny County ("trial court"), following his bench conviction for flight to avoid apprehension under 18 Pa.C.S.A. § 5126.  Upon review, we affirm.

The facts and procedural history underlying this case are undisputed. As recounted by the trial court:

> On March 27, 2015, City of McKeesport police officer Bryan Easter was on routine patrol on Fifth Avenue near the business district of the City of McKeesport.  At 8:55 a.m., a civilian approached his marked vehicle and informed Officer Easter that there was an individual attempting to open doors and windows at the vacant BMW Motorcycle Shop, located in the 1600 block of Ly[s]le Boulevard.  The civilian witness provided a description of the actor: a black male, dressed all in blue, on an orange bicycle.
>
> With that information, Offer Easter proceeded to the 1600 block of Ly[s]le Boulevard and encountered Appellant, who matched the description provided by the civilian: a black male, dressed in all blue, on an orange bicycle, riding westbound long

Ly[s]le Boulevard.[1]  Officer Easter pulled into a gravel lot ahead of Appellant and exited his vehicle to ask Appellant about what the civilian had reported.  Upon seeing Officer Easter and his marked police vehicle, Appellant changed directions to avoid Officer Easter, and crossed Ly[s]le Boulevard, traveling in the opposite direction toward Fifth Avenue.

Officer Easter reentered his vehicle and followed Appellant on Fifth Avenue.  Appellant jumped off his bicycle, then jump back on.  Officer Easter wanted to talk to Appellant about what had occurred at the BMW Motorcycle Shop, so he called out to Appellant to "hold up a minute."  Appellant ignored Officer Easter and rode away on his bicycle.  Officer Easter continued to follow Appellant and told Appellant to stop.  Appellant eventually complied by riding his bicycle over to the driver's side of Officer Easter's vehicle.  Appellant remained on his bicycle in the street.

Officer Easter exited his vehicle and directed Appellant to the rear of the police vehicle to conduct a pat-down for officer safety before speaking further with Appellant.  Officer Easter felt a wallet, which he asked Appellant to remove, and Appellant complied.  Officer Easter asked Appellant his name and date of birth, which Appellant provided.  Officer Easter entered Appellant's information into his vehicle's computer system, at which point Officer Easter discovered there was a warrant for Appellant from the state of Delaware.  Officer Easter verified that the warrant was still active.

Once it was confirmed that the warrant was still active, Officer Easter informed Appellant that he was under arrest, and approached him to place him in handcuffs.  Appellant nervously fidgeted with his bicycle handlebars, breathed heavily, and looked around.  When Officer Easter grabbed Appellant's left arm to place it in a handcuff, Appellant pushed his bicycle into Officer Easter.  Appellant jumped over the bicycle and fled on foot towards the entrance of UMPC McKeesport Hospital.  Officer Easter radioed for backup, and with Officer Herr and Sergeant Rydzak, the three officers pursued Appellant into the hospital.  A chase ensued through the hospital hallways and up two flights of stairs.  Officer Herr was eventually able to catch and attempt to detain Appellant.  However, Appellant again resisted, refusing to produce his hands, and Officer Herr had to forcibly restrain and handcuff Appellant.

---

[1] Officer Easter encountered Appellant within a block and a half.  N.T. Suppression, 9/24/15, at 11.

Trial Court Opinion, 2/16/15, at 3-6 (footnote and internal record citations omitted). On the same day, Appellant was charged with, *inter alia*, flight to avoid apprehension. On September 21, 2015, Appellant filed a motion to suppress the discovery of his identity, claiming that Officer Easter's investigative detention of Appellant was bereft of reasonable suspicion and therefore, constitutionally infirm. On September 24, 2015, following a hearing, the trial court denied Appellant's suppression motion. Shortly thereafter, Appellant agreed to proceed immediately to a stipulated nonjury trial. The trial court found Appellant guilty of flight to avoid apprehension, among other things, and sentenced him to three to six months' incarceration, and a concurrent period of six months' probation. Appellant timely appealed to this Court. Following Appellant's filing of a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal,[2] Appellant raises only a single issue for our review, namely whether "the trial court err[ed] when it determined Officer Easter possessed

---

[2] To the extent Appellant argues that Officer's Easter's pat-down search was illegal, such argument is waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Here, as the Commonwealth notes and as is confirmed by our review of the record, Appellant limited his argument in the trial court to whether Officer Easter had reasonable suspicion to conduct an investigatory detention. **See** N.T. Suppression, 9/24/15, at 3. In other words, Appellant did not argue the propriety of the pat-down search under **Terry v. Ohio**, 392 U.S. 1 (1968).

reasonable suspicion to detain [Appellant] following an anonymous tip[.]"

Appellant's Brief at 5.

In reviewing appeals from an order denying suppression, our standard of review is limited to determining

> whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In the interest of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The *Lyles* Court explained:

> Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.
>
> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have

employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

[Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted). Instantly, the parties do not dispute that Officer Easton's interaction with Appellant rose to the level of investigative detention, requiring reasonable suspicion.[3]

It is settled that reasonable suspicion necessary for investigative detentions

is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Commonwealth v. Davis*, 102 A.3d 996, 1000 (Pa. Super. 2014) (citations omitted). "In order to justify an investigative detention, the police must have reasonable suspicion that criminal activity is afoot. Reasonable

---

[3] The law governing *Terry* stops, *i.e.*, stops and searches based on reasonable suspicion, is the same under both the federal and Pennsylvania constitutions. *See In re D.M.,* 781 A.2d 1161, 1163 (Pa. 2001) (*D.M. II*) (noting that "Pennsylvania courts have consistently followed *Terry* in stop and frisk cases, including those in which the appellants allege protections pursuant to Article 1, Section 8 of the Pennsylvania Constitution.").

suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of the circumstances viewed through the eyes of a trained police officer." ***Commonwealth v. Williams***, 980 A.2d 667, 672 (Pa. Super. 2009) (citation omitted), ***appeal denied***, 990 A.2d 730 (Pa. 2010). Thus, "[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances." ***Commonwealth v. Holmes***, 14 A.3d 89, 96 (Pa. 2011) (emphasis added). In assessing the totality of the circumstances, a court must give weight to the inferences that a police officer may draw through training and experience. ***Id.*** at 95. Reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. ***Davis***, 102 A.3d at 1000 (citations omitted). "Rather, the test is what it purports to be—it requires a suspicion of criminal conduct that is reasonable based upon facts of the matter." ***Id.*** (citation and emphasis omitted).

Instantly, we find instructive ***D.M. II*** and ***Commonwealth v. Walls***, 53 A.3d 889 (Pa. Super. 2012), in deciding whether Officer Easter possessed reasonable suspicion to detain Appellant.

In ***D.M. II***, a police officer received a radio call regarding a man with a gun at 28th Street and Cecil B. Moore Avenue in Philadelphia. ***D.M. II***, 781 A.2d at 1162. The officer was only one block from the location at the time of the call. The anonymous tip described the man as a "black male, wearing

- 6 -

a white t-shirt, blue jeans and white sneakers." *Id.* The officer arrived at the scene and saw the appellant, who matched the description given by the anonymous tip. *Id.* The officer exited his vehicle and told the appellant "to come over." *Id.* The appellant, however, took off running instead. *Id.* Eventually, backup arrived and the appellant found himself cornered between two police cars. *Id.* The officer ordered the appellant to put his hands on the hood of the car in front of him and proceeded to pat the appellant down for officer safety. *Id.* The officer recovered a .32 caliber handgun that fell out of the appellant's pant leg. *Id.* Given the facts, our Supreme Court determined that the officer had the reasonable suspicion necessary to stop the appellant. *Id.* at 1164-65. In so doing, the Supreme Court noted that under *Illinois v. Wardlow*, 528 U.S. 119 (2000), "unprovoked flight could be considered among the relevant contextual considerations, since 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion' and 'headlong flight—whenever it occurs— is the consummate act of evasion.'" *D.M. II*, 781 A.2d at 1164 (citing *Wardlow*, 528 U.S. at 124).

In *Walls*, a police officer received information over his radio that a black male wearing a black coat and black jeans was observed at an intersection carrying a gun. The officer stopped an individual, who matched the description of the suspect with regard to gender, race, and clothing one-half block away from the identified location. After seeing the officer, the individual fled. *Walls*, 53 A.3d at 894. Relying upon *D.M. II* and

*Wardlow*, the *Walls* Court concluded that an unprovoked flight, *even when not in a high crime area*, combined with an individual's proximity to the subject location and his match to the description of the suspect, gave "rise to reasonable suspicion that criminal activity was afoot." *Id.* at 894 (emphasis added).

As recited earlier, Officer Easter received an in-person, face-to-face, tip from a civilian that a black male attired in blue and on an orange bicycle was attempting to open doors and windows at a vacant BMW Motorcycle Shop. As the suppression transcript reveals, Officer Easter testified that the shop "has been unoccupied for a long period of time." N.T. Suppression, 9/24/15, at 6. With this information in hand, Officer Easter proceeded to investigate the tip. Within close proximity of the vacant shop, Officer Easter spotted Appellant who matched the description provided by the in-person tipster. Specifically, when Officer Easter spotted Appellant, a black male, he was dressed in blue and rode an orange bicycle. Upon seeing Officer Easter, Appellant exhibited evasive behavior in that he crossed Lysle Boulevard to travel in the opposite direction toward Fifth Avenue. When Officer Easter directed Appellant to stop, he initially disregarded Officer's Easter's direction and continued to ride away on bicycle. Eventually, Appellant complied with Officer Easter's command by riding his bicycle over to the driver's side of Officer's Easter's vehicle.

Based on these facts, this case is distinguishable from *D.M. II* and *Walls* only in one respect. Here, unlike the anonymous telephone calls in

*D.M.* and *Walls*, Officer Easter received an in-person, face-to-face tip from a citizen who conveyed his first-hand account of what he had witnessed at the vacant BMW Motorcycle Shop.[4]  Because of the in-person, face-to-face nature of the tip, we conclude that it carried a greater indicia of reliability than anonymous tips received over the telephone.  *See United States v. Valentine*, 232 F.3d 350, 354, 357 (3d. Cir. 2000) (noting that an in-person tip based on first-hand account is more reliable than an anonymous telephone call).  Officer Easter here could assess the informant's credibility as he spoke, likely knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out.  *Id.*

In all other respects, we discern no difference between this case and *D.M. II* and *Walls*.  Like the anonymous tip in *D.M. II* and *Walls*, the tip here was corroborated by Officer Easter to the extent that Officer Easter located Appellant, who matched the physical description, clothing and the orange bicycle, in the vicinity of the vacant BMW Motorcycle Shop.  As stated, Officer Easter received a first-hand account that a black male attired in blue with an orange bicycle was attempting to open doors and windows at the vacant shop.  Potential innocent explanations for Appellant's conduct at the vacant BMW Motorcycle Shop do not negate the reasonableness of Officer Easter's suspicion of criminal activity.  *See Davis*, *supra*, at 1000.

---

[4] Like in *D.M. II*, here the record is silent as to whether Officer Easter encountered Appellant in a high-crime area.

When Officer Easter spotted Appellant who matched the specific description of the individual provided face-to-face by the tipster, Appellant evaded Officer Easter by crossing the street to travel in the opposite direction. Thereafter, when Officer Easter demanded that Appellant stop, Appellant initially disregarded his command and rode away on his bicycle. Given the totality of the circumstances here, and consistent with our holdings in **D.M. II** and **Walls**, we are constrained to agree with the trial court that Officer Easter possessed the requisite reasonable suspicion to stop Appellant. Accordingly, the trial court did not err in denying Appellant's suppression motion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2016